398 F.Supp. 21 (1975)
DONOHOE CONSTRUCTION COMPANY, INC.
v.
The MARYLAND-NATIONAL CAPITAL PARK AND PLANNING COMMISSION et al.
Civ. No. Y-74-1210.
United States District Court, D. Maryland.
July 29, 1975.
*22 Roy I. Niedermayer, Washington, D. C., for plaintiff.
Barbara A. Sears, Silver Spring, Md., Charles Rand, Rockville, Md., for defendants.

*23 MEMORANDUM AND ORDER
JOSEPH H. YOUNG, District Judge.
The plaintiff, complaining that the defendants have jointly promulgated zoning plans, ordinances, and building-permit decisions which have effected a taking of its North Park Avenue property in Bethesda, Maryland, seeks declaratory relief and an award of just compensation for the property allegedly taken. As originally filed, the plaintiff's Complaint asserted that its cause of action arose directly under the Fourteenth Amendment of the Federal Constitution and that this Court had jurisdiction over the subject matter by virtue of 28 U.S.C. §§ 1331 and 1332. Motions to dismiss filed by defendants Commission and Board were denied by Memorandum and Order of March 21, 1975. On its own motion, the Court noted a potential abstention problem with the case and ordered memoranda from the parties addressed to that question.[1] The defendants have now answered the Complaint; they and the plaintiff have filed the required memoranda; and the plaintiff has offered a new motion to amend his Complaint to drop his allegation of diversity jurisdiction, add a cause of action under 42 U.S.C. § 1983, and assert new jurisdictional bases for the action28 U.S.C. §§ 1343 and 2201.

I. PLAINTIFF'S MOTION TO AMEND
Turning first to the plaintiff's motion to amend, the Court has no problem with plaintiff's request to drop the diversity allegation. There is no such jurisdiction in this Court if, as plaintiff now declares, it is a Maryland corporation. The allegation that this Court has jurisdiction by virtue of the Declaratory Judgment Act, 28 U.S.C. § 2201, may be disposed of with equal facility  though adversely to the plaintiff. Section 2201 is not a jurisdictional grant. See Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671-72, 70 S.Ct. 876, 94 L.Ed. 1194 (1950).
The plaintiff's attempt to fit its complaint within the confines of the Ku Klux Klan Act of 1871, presently codified as 28 U.S.C. § 1343(3) and 42 U.S.C. § 1983, poses more of a problem. It has been clear since Lynch v. Household Finance Corporation, 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972), that the Ku Klux Klan Act may be invoked where property rights are concerned as well as when personal rights are it issue. It is equally clear, however, that municipal corporations are not "persons" for the purposes of the substantive half of the Act, 42 U.S.C. § 1983, both where claims of damages are made, see Monroe v. Pape, 365 U.S. 167, 187-91, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), and where equitable relief is sought, see City of Kenosha v. Bruno, 412 U.S. 507, 513, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973). The Court will take judicial notice of the fact that Montgomery County is a municipal corporation under Maryland law. See Md. Ann.Code art. 23A, § 9 (1973 Repl.Vol.). The County is therefore not a "person" under the Ku Klux Klan Act and neither is its legislative arm, the County Council. It may be that the Commission and/or the Planning Board could be considered "persons" for Ku Klux Klan Act purposes and that there would be no Eleventh Amendment problem in reaching them. Cf. Arnold v. Prince George's County, 270 Md. 285, 292 n. 1, 311 A. 2d 223, 227 and accompanying text (1973). Since section 1983 is the door through which this Court's subject matter jurisdiction under section 1343(3) is to be reached, it does not have jurisdiction, insofar as the County and County Council are concerned, under section 1343(3). *24 The Court reaches no conclusion as to the Commission and Planning Board. If the plaintiff wishes to pursue the matter, it may do so by providing an additional memorandum in support of its position. Finding subject matter jurisdiction under section 1343(3) is not essential, however, since the Court does have subject matter jurisdiction over all of the defendants under 28 U.S. C. § 1331.[2]

II. ABSTENTION
With the plaintiff's withdrawal of its assertion of diversity jurisdiction, the Court is left with an abstention problem that has been considerably simplified.[3] The abstention question which remains is but a variation on the classic theme of Railroad Comm'n of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).
Abstention of the Pullman variety becomes a consideration in cases where state action is challenged in federal district court as being contrary to the Federal Constitution and there are questions of state law present which may be dispositive of the case. See C. Wright, Law of Federal Courts § 52, at 196 (2d ed. 1970). The starting point for the doctrine is the premise of Siler v. Louisville and Nashville R. R. Co., 213 U.S. 175, 29 S.Ct. 451, 53 L.Ed. 753 (1909), providing that where a controverted question of state law underlies a question of federal constitutional law, federal courts will decide the state law question first in order to avoid the potential federal constitutional question. If state law is unclear, to the extent that the highest state court has not ruled upon it, the federal court will abstain until state law is clarified. Only if the plaintiff does not prevail on the state law question will the district court take up the federal constitutional issue. See Field, supra note 1, at 1077-78; Note, Judicial Abstention from the Exercise of Federal Jurisdiction, 59 Colum.L.Rev. 749, 753-56 (1959).
The customary Pullman case involves an unclear state statute or administrative order. This case differs from the norm. Viewing the plaintiff's allegations in their most favorable light, the plaintiff asserts that the defendants have made a number of decisions regarding the zoning of its land and the issuance of building permits for its property which have precluded all reasonable use of the property by the plaintiff or its sale to another. The plaintiff therefore seeks a declaration that the defendants have taken its property in violation of its Fourteenth Amendment rights under the Federal Constitution, and it also demands just compensation for the property it claims has been taken. The abstention problem thus posed is not one of unclear statutory law. It is instead the much more troublesome problem of unclear state constitutional law, for, as the Court pointed out to the parties in its earlier Memorandum and Order, Maryland's constitution and Declaration of Rights also forbid the taking of private property without compensation. See Md.Declaration of Rights art. 19; Md. Const. art. III, §§ 40 & 40A.
Where non-constitutional questions of unclear state law are concerned, *25 there are essentially three requirements which must be met before the federal courts will abstain: (1) State law must be unclear; (2) It must be subject to an interpretation that will avoid the federal constitutional question; and (3) There must be available an adequate state proceeding for obtaining resolution of the state law issue. See Field, supra note 1, at 1088 n. 74 and accompanying text. Where state constitutional law is concerned, however, the focus changes somewhat.
Most state constitutions have a number of provisions, e. g., a due process or equal protection clause or its equivalent, which are patterned on federal constitutional rights and have been interpreted in a manner which conforms to the Supreme Court interpretation of their federal constitutional counterparts.[4] On the other hand, there are provisions in state constitutions that are unique to the individual state. Thus, state constitutional law questions in the abstention context fall into two categories  those cases where the state constitution is the mirror of the federal and those where the state constitution reflects purely local legal development.
The Supreme Court recognizes a distinction between these two categories of cases in its treatment of abstention where state constitutional issues are involved. Four decisions by the Court provide some illumination  City of Meridian v. Southern Bell Tel. & Tel. Co., 358 U.S. 639, 79 S.Ct. 455, 3 L.Ed. 2d 562 (1959); Reetz v. Bozanich, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970); Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971); and Askew v. Hargrave, 401 U.S. 476, 91 S.Ct. 856, 28 L.Ed.2d 196 (1971). The Ninth, Seventh and Second Circuits have examined these four cases and concluded that Meridian and Reetz stand for the proposition that abstention will be required where state constitutional law is uncertain and unique but will not be required in cases like Constantineau where federal and state provisions track one another. See Drexler v. Southwest DuBois School Corp., 504 F.2d 836, 839 (7th Cir. 1974) (en banc); Stephens v. Tielsch, 502 F.2d 1360, 1361 nn. 1 & 2 and accompanying text (9th Cir. 1974); Reid v. Board of Educ., 453 F.2d 238, 244 (2d Cir. 1971). Unfortunately, Hargrave does not fit comfortably into such an analysis. As Ninth Circuit Judge Choy noted:
In Hargrave the plaintiff challenged an educational taxing scheme on equal protection grounds. In a brief per curiam the Court ordered abstention. It is not clear that what the Supreme Court wished the state courts to initially decide was a claim based on the state's counterpart to the equal protection clause. However, it does seem likely that there were non-mirror state issues in the case, for otherwise it certainly would have been appropriate for the Court to have discussed Constantineau . . .. Even were that not so, there is a critical difference between Hargrave . . . and Constantineau . . .. In Hargrave another action making the same challenge was pending in the Florida courts, a factor on which the Court relied. There was then "a substantial and immediate possibility of obviating [the] federal claim by a decision on state law grounds." Steffel v. Thompson, 415 U.S. 452, 475 n. 22, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974) (emphasis added).
Stephens v. Tielsch, 502 F.2d 1360, 1361-62 (9th Cir. 1974). Judge Choy, then, suggests that Hargrave may mean that abstention will be required even in "mirroring" situations where there is *26 another, state-provided route immediately available for resolving the state constitutional law question.[5]
Meridian, Reetz, Constantineau, and Hargrave suggest that in Pullman situations, where it is state constitutional law that is unclear, lack of a definitive state precedent alone will not be the key factor triggering abstention. Instead, abstention will be governed by the nature of the constitutional question presented. If state and federal constitutional questions in a Pullman case are effective carbon copies of one another, Constantineau applies, and the Court will not abstain. If a state constitutional provision is unique, Reetz and Meridian apply, and abstention will be required if the other two requirements for abstention  the possibility of avoiding the federal question and the availability of an adequate state remedy  are met. If there is another, parallel proceeding going on or readily available in state court, however, Hargrave arguably means that abstention may be ordered, even in a Constantineau fact situation, though this Court is not persuaded that Hargrave must be read to stand for such a position. See note 5 supra.
There are a number of recent federal cases which are somewhat analogous to the instant matter. In Ballard Fish & Oyster Co. v. Glaser Constr'n Co., 424 F.2d 473 (4th Cir. 1970), the Fourth Circuit ruled out abstention in an inverse condemnation action[6] brought under the Fourteenth Amendment by the owner of a James River oyster bed. The defendant, a public service corporation to which the Commonwealth of Virginia had delegated its powers of eminent domain, constructed a gas pipeline over the plaintiff's oyster bed without first acquiring an easement either by grant or condemnation. The Virginia equivalent of the Fourteenth Amendment bar against takings without compensation was raised, but the Court of Appeals declined to order abstention, which it characterized as an "exhaustion of remedies" problem in the case before it. See 424 F.2d at 475.[7]
*27 The Sixth Circuit, in a recent inverse condemnation case, Muskegon Theatres, Inc. v. City of Muskegon, 507 F.2d 199, 202 (6th Cir. 1974), declined to follow Ballard. In Muskegon, plaintiff claimed that the defendant municipality had taken its leasehold without compensation as the result of certain urban renewal activities, a claim which arose both under the federal constitutional provision against such takings and its Michigan constitutional equivalent. Confronted by the fact that it had failed to abstain in its Foster series of inverse condemnation cases,[8] the Sixth Circuit concluded that abstention had always been appropriate in those cases but for the fact that at the time they were decided Michigan had no appropriate remedy available. See 507 F.2d at 205. Finding that a remedy had since become available, the Circuit Court held that Michigan constitutional and statutory law with regard to the taking of leaseholds was unclear and that abstention was required, see id. at 204-05, and failed to mention the Reetz-Meridian/Constantineau dichotomy in the Supreme Court's treatment of abstention where state constitutional law is involved.
The Sixth Circuit also refused to follow three federal district court opinions which looked at the abstention problem in the eminent domain context and concluded that abstention was not required. See 507 F.2d at 203. Of the three cases, one, Eleopoulus v. Richmond Development Agency, 351 F.Supp. 63 (N.D.Cal. 1972), was distinguished as being akin to the Sixth Circuit's Foster decisions. See id. The Muskegon court had somewhat more difficulty with the remaining two  Joiner v. City of Dallas, 380 F. Supp. 754 (N.D.Tex.), aff'd mem., 419 U.S. 1042, 95 S.Ct. 614 42 L.Ed.2d 637 (1974) and Town of East Haven v. Eastern Airlines, Inc., 282 F.Supp. 507 (D. Conn.1968). East Haven was an inverse condemnation action brought by property owners who claimed that traffic at a municipal airport worked a taking of their property. The defendant city argued that such a taking, if proved, would violate state constitutional law as well as the Federal Constitution and urged that the plaintiff be required to go to the state court first. The Connecticut district court refused to abstain. Noting that no state statute was under attack, the district court anticipated the Reetz/Constantineau distinction when it concluded that abstention would not be required because "the constitutional question is not a novel one." See 282 F.Supp. at 516. The Sixth Circuit, in its criticism of East Haven, failed to recognize the significance of this Constantineau-like holding.[9]
*28 Joiner's relevance to the Muskegon case and the matter before this Court is not readily apparent, since it involved a substantially different fact situation. In Joiner a three-judge federal district court was asked to declare two Texas statutes, one governing Texas condemnation procedure and the other delegating the state's condemnation powers to its municipal corporations, unconstitutional. The state law question was construed by the district court to exist on the statutory level. There is no mention of the problems of state constitutional law, hence the lack of significance in terms of Muskegon and this Court's inquiry. Abstention is a term used to describe a number of doctrines, see C. Wright, supra § 52, and the Joiner opinion touches on some of them. But, boiled to its essence, Joiner is more akin to the kind of abstention considered in Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943) and Martin v. Creasy, 360 U.S. 219 79 S.Ct. 1034, 3 L.Ed.2d 1187 (1959), than it is to a Pullman-doctrine case.[10]
*29 The Sixth Circuit did find support for its position in a pre-Reetz-Constantineau-Hargrave decision by the Fifth Circuit, Creel v. City of Atlanta, 399 F.2d 777 (5th Cir. 1968), another airport case, but unlike East Haven's defendant, the defendant in Creel had instituted a condemnation action in state court to take the plaintiffs' property subsequent to the plaintiffs' filing suit in federal court claiming that their property had been taken. The Fifth Circuit held that where an inverse condemnation action is pending in federal court and a state condemnation proceeding involving the same parties is going on simultaneously, the federal court should stay its hand unless it is clear that the property owner cannot get relief in the state proceeding. See 399 F.2d at 779. Thus Creel dovetails nicely with Judge Choy's analysis of Hargrave. See note 5 supra and accompanying text. Assuming that Judge Choy's interpretation of Hargrave is sound, Creel may be reconciled with the Reetz-Constantineau distinction by viewing it as an example of the Hargrave exception to the Constantineau rule for "mirroring" cases of federal and state constitutional law. Muskegon dismisses the fact that there was an on-going state proceeding at work in Creel as inconsequential. See 507 F.2d at 202. This Court would reach the opposite conclusion  that fact is the lynch pin of Creel if Creel is to be reconciled with the Supreme Court cases on Pullman abstention in the state constitutional context.
The suggestion implicit in Muskegon is that where abstention problems are concerned, cases which involve state eminent domain powers are a law unto themselves. The Supreme Court's pronouncements on that point are somewhat less than clear. Compare Louisiana Power & Light Co. v. City of Thibodaux, 360 U.S. 25, 28-30, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959), with Allegheny v. Frank Mashuda Co., 360 U.S. 185, 196, 79 S.Ct. 1060, 3 L.Ed.2d 1163 (1959). This Court is inclined to follow the dictum of the majority in Mashuda that there is nothing "mystical" about eminent domain which requires it to be treated differently than other cases which concern the powers of a state. See 360 U.S. at 190-92, 79 S.Ct. 1060. In cases like the present one, where federal constitutional questions have state constitutional counterparts, the general rules which emerge from the Supreme Court's consideration of the Pullman doctrine in the federal/state constitutional context are applicable. If Muskegon suggests anything to the contrary, this Court declines to follow its lead.
Turning to the case at hand, it is perfectly clear that in the realm of takings without compensation, federal and Maryland constitutional law are effectively the same. The Court of Appeals of Maryland has itself made that point in unmistakable terms on numerous occasions. See, e. g., Bureau of Mines of Maryland v. The George's Coal & Land Co., 272 Md. 143, 156, 321 A.2d 748, 755 (1974); Allied American Mutual Fire Ins. Co. v. Comm'r of Motor Vehicles, 219 Md. 607, 615-16, 150 A.2d 421, 426-27 (1959); Krebs v. Uhl, 160 Md. 584, 588, 154 A. 131, 133 (1931).[11] Whatever ambiguity there is in Maryland's law on this question, it is an ambiguity shared by federal constitutional *30 law. Thus, this is a case which calls for the application of the Constantineau, no-abstention rule.
The case does present a Hargrave problem, however, of the kind suggested by Judge Choy. The defendants note that two state court actions are presently pending concerning the property at issue here. See In re Application No. F-947, Law No. 40663 (Montgomery Cty.Cir.Ct., filed Aug. 23, 1974); Donohoe Constr'n Co. v. Maryland-Nat'l Pk. & Pl'g Comm'n, Equity No. 48801 (Montgomery Cty.Cir.Ct., filed April 1, 1974). Neither case, however, satisfies the requirements of Hargrave. The plaintiff's bill of complaint for equitable relief seeks a declaration that the County has wrongfully withheld a building permit. The action at law is an appeal from a zoning decision by the County Council acting in its capacity as District Council for the County portion of the Maryland-Washington Regional District. While the plaintiff does base its appeal in part on allegations that the Council's action constitutes an unconstitutional taking without compensation, see In re Application No. F-947, Law No. 40663, ¶¶ e & s (Montgomery Cty.Cir.Ct., filed Aug. 23, 1974), the action is not the equivalent of an inverse condemnation proceeding since a reversal of the challenged zoning decision is sought, not compensation for an unconstitutional taking. Even with Judge Choy's analysis, then, Hargrave does not apply.
Even were the Court to follow Muskegon's lead, it would be required to conclude that abstention is not appropriate, given the facts of this case. While Maryland does recognize the inverse condemnation concept, see note 6 supra, where takings by zoning are alleged, Maryland requires those who would litigate in its courts to first exhaust administrative remedies. See Arnold v. Prince George's County, 270 Md. 285, 297-300, 311 A.2d 223, 229-30 (1973). An exhaustion requirement attenuates the potential remedy sufficiently to place the remedy in question in this case into the same category as the Foster series distinguished by Muskegon. See note 8 supra.
There are advantages to abstention, but they are advantages purchased at a high price. See Field, supra note 1, at 1085-88. The time delays which abstention imposes upon litigants are often staggering. See, e. g., United States v. Leiter Minerals, Inc., 381 U.S. 413, 85 S.Ct. 1575, 14 L.Ed.2d 692 (1965) (case dismissed as moot eight years after abstention order); Spector Motor Serv., Inc. v. O'Connor, 340 U.S. 602, 71 S.Ct. 508, 95 L.Ed. 573 (1951) (six years between time Supreme Court ordered abstention and the Court's ultimate decision on the merits.) For that reason, the federal courts should abstain from exercising their jurisdiction only in those situations where deferring to state adjudication is likely to avert real harm. See Field, supra note 1, at 1087-88. Where state and federal constitutional issues are identical, nothing of sufficient substance is gained to offset the price of abstention. See id. at 1099 n. 108. The three-judge court which decided the Joiner case summed up the abstention dilemma as follows:
Abstention is a formidable doctrine in the federal forum comprised of medusan components that, absent the most meticulous inspection, will transfix and render powerless both litigants and jurists. Its application should be grounded on fixed principles, strictly applied to the facts of the federal litigation, for an equally formidable doctrine obligates the federal judiciary as much to exercise jurisdiction properly invoked as to dismiss a proceeding where jurisdiction is wanting. Abstention must rest on sound jurisprudential underpinnings; it must not be a label for a visceral aversion to our Article III obligation to adjudicate.
Joiner v. City of Dallas, 380 F.Supp. 754, 763 (N.D.Tex.), aff'd mem., 419 *31 U.S. 1042, 95 S.Ct. 614, 42 L.Ed.2d 637 (1974).
For the reasons stated, it is this 29th day of July, 1975, by the United States District Court for the District of Maryland, ordered:
1. That the plaintiff's motion to amend its complaint be, and the same is, hereby granted only insofar as plaintiff deletes its allegation of diversity jurisdiction; and
2. That this Court shall not abstain in the exercise of its jurisdiction over this controversy.
NOTES
[1] As the Sixth Circuit recently noted, the propriety of a district court raising the question of abstention sua sponte is well-established. See Muskegon Theatres, Inc. v. City of Muskegon, 507 F.2d 199, 201 (6th Cir. 1974); Field, Abstention in Constitutional Cases, 122 U.Pa.L.Rev. 1071, 1144 n. 198 and accompanying text (1974).
[2] Plaintiff's Complaint shall be construed as arising directly under the Fourteenth Amendment. See Brault v. Town of Milton, 43 U.S. L.W. 2388 (2d Cir. Feb. 24, 1975); Dahl v. City of Palo Alto, 372 F.Supp. 647, 649-51 (N.D.Cal.1974).
[3] While the Supreme Court has indicated that federal courts should not abstain in diversity cases, see Meredith v. Winter Haven, 320 U.S. 228, 236-38, 64 S.Ct. 7, 88 L.Ed. 9 (1943), the Court's decisions in Louisiana Power & Light Co. v. Thibodaux, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959), and Kaiser Steel Corp. v. W. S. Ranch Co., 391 U.S. 593, 88 S.Ct. 1753, 20 L.Ed.2d 835 (1968), suggest that abstention may be required in diversity cases where a federal court decision on state law will have great impact on state policy. The Court has taken a similar position in cases where both federal question and diversity jurisdiction are alleged. See, e. g., Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943).
[4] The constitution of every state either expressly has, or has had read into it, a provision barring takings of private property without compensation. See Note, Inverse Condemnation: Its Availability in Challenging the Validity of a Zoning Ordinance, 26 Stan.L.Rev. 1439, 1439-40 n. 3 (1974).
[5] Judge Choy's inference that Hargrave may in fact be a case where unique local constitutional provisions are at work finds substantial support in the three-judge-court decision from which the Hargrave opinion sprang. Plaintiffs in Hargrave attacked, as unconstitutional on federal equal protection grounds, a Florida statute limiting county educational ad valorem property taxes. These taxes were authorized by provisions in the Florida Constitution which, of course, have no federal counterpart. See Hargrave v. Kirk, 313 F.Supp. 944, 946 (M.D.Fla.1970). If these unique Florida constitutional provisions were the key variable in the Supreme Court's decision in favor of abstention, then Hargrave is merely another case in the Meridian-Reetz category and in no way conflicts with Constantineau. Hargrave itself, though somewhat cryptic, strongly suggests that the Court saw the case as one of "state law claims under the Florida Constitution" in the Reetz category rather than as a Constantineau situation where the state and federal constitutions are essentially the same. See 401 U.S. at 478, 91 S.Ct. at 858.
[6] "Inverse condemnation is a cause of action available to a property owner whose property has been taken or damaged for public use and and who has not been paid just compensation . . .. Inverse condemnation differs from eminent domain in that the action is initiated by the [property] owner rather than by the government . . .. In some states, statutes set out the right of inverse condemnation . . .. In other states, and under the United States Constitution, the constitutional provision providing for just compensation supplies the basis for an action in inverse condemnation." Note, supra note 4, at 1441-42 n. 9.
[7] The Fourth Circuit talked in terms of "exhaustion" of state judicial remedies rather than abstention. See 424 F.2d at 475. Where a federal court has jurisdiction concurrent with jurisdiction which could be found in a state court, exhaustion, of course, is not required. See C. Wright, Law of Federal Courts § 49, at 187 (2d ed. 1970). Abstention is a somewhat different concept, and the Fourth Circuit was criticized, at least by implication, by the Sixth Circuit for its failure to apply the appropriate label in its decision. See Muskegon Theatres, Inc. v. City of Muskegon, 507 F.2d 199, 202 n. 13 (6th Cir. 1974). As both the Second and Seventh Circuits have recognized, however, if the federal courts were to abstain in cases where a state constitutional right is the mere equivalent of a federal constitutional right, the effect would be to create an exhaustion-of-state-judicial-remedies requirement which the Supreme Court has forbidden in cases where a federal remedy is supplemental to a state remedy. See Drexler v. Southwest DuBois School Corp., 504 F.2d 836, 838-39 (7th Cir. 1974 en banc); Reid v. Board of Educ., 453 F.2d 238, 242 (2d Cir. 1971). Viewed in the context of Drexler and Reid then, Ballard can be read to mean that no abstention is permissible in eminent-domain, federal-question cases where the state law in question is a state constitutional provision which mirrors a federal constitutional equivalent.
[8] See Foster v. City of Detroit, 405 F.2d 138 (6th Cir. 1968), aff'g. 254 F.Supp. 655 (E.D.Mich.1966); Foster v. Herley, 330 F. 2d 87 (6th Cir. 1964), rev'g 207 F.Supp. 71 (E.D.Mich.1962).
[9] Muskegon takes the position that East Haven is analogous to Martin v. Creasy, 360 U.S. 219, 79 S.Ct. 1034, 3 L.Ed.2d 1186 (1959). See 507 F.2d at 203. The analogy will not hold, however, since Creasy was a three-judge-court action brought by certain property owners to bar the enforcement of a Pennsylvania statute which provided for the payment of compensation only for "an actual taking of property" in the construction and/or designation of limited access highways by the Commonwealth. See 360 U.S. at 221, 79 S.Ct. 1034. The property owners argued that Pennsylvania courts would interpret the statute to mean that compensation would be paid only if land were physically taken and that the right of access would not be recognized by the Pennsylvania courts as a compensable property right. The three-judge court abstained to enable the parties to get an interpretation of their rights by the state courts. A declaratory judgment was sought. While the state courts declined to address the specific question of whether or not access rights were recognized as compensable property rights under Pennsylvania law, they did declare that the plaintiffs' rights would be fully protected under the statute. See id. at 222, 79 S.Ct. 1034. The three-judge federal court then took jurisdiction once again, found that the plaintiffs would be irreparably harmed during the period required to adjudicate their rights in the state courts, and permanently enjoined the state from proceeding under the statute. See id. at 223, 79 S.Ct. 1034. The Supreme Court, in reviewing the three-judge-court decision, first assumed that there was some basis for the lower court's decision on the merits and then went on to the problem of abstension. The district court was reversed and ordered to decline to adjudicate the controversy. The Court made some mention of Pullman, see 360 U.S. at 224, 79 S.Ct. 1034, but its actual decision is of another order. The usual approach in Pullman cases is to decline to adjudicate temporarily but to retain jurisdiction. See C. Wright, supra § 52 at 198 n. 19 and accompanying text. Pullman-type abstention had already been tried in Creasy. In ordering the lower court to dismiss, the Supreme Court apparently was requiring the plaintiffs to make all of their claims, state as well as federal, in the state courts notwithstanding the assertion of federal question jurisdiction. The most reasonable explanation of Creasy is that it is not a Pullman case at all. Rather it is a case in the mold of Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), where abstention is mandated, and the matter dismissed without retention of jurisdiction, so that the federal courts may avoid interference with the administration by a state of major state policies. See id. at 199 n. 30 and accompanying text.

Muskegon attached no significance to the fact that Creasy involved a state-wide statute while East Haven was concerned only with the consequences of a city ordinance for a limited amount of real state. See 507 F.2d at 203-04. This difference is the key, however, to the distinction between Creasy and East Haven, for in Creasy a major state policy was under attack, making Burford-type abstention applicable, while in East Haven purely local concerns were at issue, which left abstention questions, if any, within the Pullman framework. Once the East Haven court found that the constitutional issue had no unique state-law aspects to it, it was justified in not abstaining given the gloss on the Pullman doctrine later articulated by the Supreme Court in Constantineau.
[10] One could argue, of course, that once the Texas court concluded that Burford was no obstacle, it should have taken up Pullman. It did in fact discuss the applicability of the Pullman doctrine, see 380 F.Supp. at 763, but it concluded both that Texas statutory law was clear and that abstaining offered no hope of avoiding a federal question, given the clarity of Texas law. Thus, two of the three Pullman prerequisites were missing. The federal three-judge court did not consider whether or not the existence of a Texas constitutional ban on takings without compensation, see Tex.Const. art. I, § 17, Vernon's Ann.St., gave rise to a Pullman problem on the state constitutional level. Had it done so, Joiner might have shed some light on the problem present both in Muskegon and in this case. But since no mention was made of that problem in the three-judge-court opinion, and since no opinion was issued by the Supreme Court, Joiner has no precedential value here.

The more interesting question with regard to Joiner is how that case is to be distintinguished from Martin v. Creasy, 360 U.S. 219, 79 S.Ct. 1034, 3 L.Ed.2d 1187 (1959), but that is an inquiry which need not be pursued here.
[11] Maryland's highest court has recognized that property owners may bring suit for just compensation in cases where their property has been allegedly taken without payment of compensation by the state or its delegate through the exercise of the state's eminent domain powers. See, e. g., Sanderson v. Mayor & City Council of Baltimore, 135 Md. 509, 523, 109 A. 425, 430 (1920); Walters v. Baltimore and Ohio R.R. Co., 120 Md. 644, 88 A. 47 (1913); DeLauder v. County Comm'rs, 94 Md. 1, 8, 50 A. 427, 429-30 (1901). The "inverse condemnation" label itself is a relative late-comer to Maryland jurisprudence. See Leet v. Montgomery County, 264 Md. 606, 615 n. 3, 287 A.2d 491, 497 n. 3 (1972); MacLeod v. City of Takoma Park, 257 Md. 477, 481, 263 A.2d 581, 584 (1970).